IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

NOV 2 4 2015

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

XAVIER WORTHINGTON,

     Plaintiff,

v.                                         Civil Action No. 3:15cv410

ROSE PALMER, ESQ.,
BON SECOURS – ST. MARY'S
HOSPITAL,
CASTLE REAL ESTATE, INC.,
BONITA WALLACE,
JEWISH FAMILY SERVICES,
MCGRATH & DANIELSON,
MOTORCYCLE LAW GROUP,
TWO UNKNOWN SIGNATORIES/
WITNESSES FROM MOTORCYCLE LAW
GROUP TO ALLEGED WILL OF
CLYDE H. SEGEAR,
SARAH BETH KEUKEN,
ELIZABETH C. MOOZ, ESQ.,
TARA A. CRISINATI,
DONSHEA SMITH,
HENRICO COUNTY CIRCUIT COURT
JUDGE I, AND
HENRICO COUNTY CIRCUIT COURT
JUDGE II,

     Defendants.

## MEMORANDUM OPINION

This matter is before the Court on the MOTION TO DISMISS of

Defendants J. Thomas McGrath P.C. t/a McGrath & Danielson and

Motorcycle Law Group, mistakenly named by Plaintiff Xavier

Worthington ("Worthington") as McGrath & Danielson and

Motorcycle Law Group ("McGrath, P.C."), Sarah K. Rittenberry,

mistakenly named by Worthington as Sarah Beth Keuken ("Keuken/Rittenberry"); Lindsey Norment, named by Worthington as one of "Two Unknown Signatories/Witnesses from Motorcycle Law Group to Alleged Will of Clyde H. Segear" ("Norment"); and J. Thomas McGrath, named by Worthington as one of "Two Unknown Signatories/Witnesses from Motorcycle Law Group to Alleged Will of Clyde H. Segear" ("McGrath") (collectively, "the McGrath Defendants") (ECF No. 7); DEFENDANT JEWISH FAMILY SERVICES' MOTION TO DISMISS (ECF No. 11); DEFENDANT JUDGES' MOTION TO DISMISS (ECF No. 13); DEFENDANTS BON SECOURS – ST. MARY'S HOSPITAL, TARA A. CRISINATI, AND DONSHEA SMITH'S MOTION TO DISMISS PURSUANT TO FED R.S CIV. P. 12 (b)(1) & (6) (ECF No. 15); DEFENDANT ROSE PALMER, ESQ.'S MOTIONS TO DISMISS (ECF Nos. 26, 27); DEFENDANT ELIZABETH C. MOOZ'S MOTION TO DISMISS (ECF No. 35); and CASTLE DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) & 12(b)(6) (ECF No. 43). For the reasons set forth herein, Defendants' motions will be granted.

## I.    BACKGROUND

In a Complaint that is long on rhetoric and conclusory assertions and short on specificity, Xavier Worthington (sometimes self-identified as "XW"), who claims to be the grandson of Clyde H. Segear ("Segear"), asserts a variety of claims against twelve named, and two unnamed, defendants. Those

2

claims arise out of the following scenario, recounted from paragraphs 16 through 38 of Worthington's Complaint (ECF No. 1). The facts are recited as they are stated in the Complaint, as best they can be sorted from the rather rambling, conclusory text.

On or about March 26, 2013, Segear entered Bon Secours-St. Mary's Hospital complaining "about his leg/foot." While hospitalized, Segear was evaluated on March 28 and April 2, 2013 by Dr. Durre Khan to determine whether Segear "had the capacity to make decisions for himself and his wife." Dr. Khan determined that Segear "retained the capacity to make decisions."

For reasons and under circumstances not recited in the Complaint, in "April/May, 2013," Bon Secours filed, in the Circuit Court of Henrico County, Virginia, a Petition for Appointment of Guardian and Conservator for Segear. To secure that result, it is alleged that Bon Secours and its employees (unnamed) administered Prednisone to induce symptoms of incapacity in Segear.

Mooz, a lawyer, was appointed by Judge I as guardian ad litem for Segear. Mooz interviewed Segear "to have him deemed incapacitated," notwithstanding awareness of the two previous evaluations made by Dr. Khan. Mooz worked with Smith, a case manager at Bon Secours, and Crisinati, a nurse practitioner at

3

Bon Secours, to arrange a follow-up evaluation of Segear that, for unarticulated reasons, is alleged to be illegal. On June 14, 2013, after the date on which Segear had received Prednisone, Crisinati prepared an evaluation reportedly concluding that Segear "did not retain the capacity to make decisions."

Palmer, a lawyer, who was appointed by Judge I to be Segear's "Guardian and Conservator," presented the Crisinati report to Judge I "so that she could be appointed Guardian and Conservator." At the time that Judge I held that Segear was incapacitated and appointed Palmer, he allegedly knew that the Petition and the diagnosis were false. There are no facts alleged to support that conclusory assertion.

Segear died on July 14, 2013, apparently leaving a will that was authored by employees of the law firm McGrath, P.C., and that was notarized by Keuken (whose correct name is Sarah Rittenberry), an employee of McGrath, P.C.[1]

Jewish Family Services is said to have falsely claimed "rights over [Segear's] bank accounts" and is alleged somehow to have depleted them. Castle Realty, Wallace (one of that firm's employees), and Palmer are alleged to have illegally sold

---

[1] Worthington pled that Keuken/Rittenberry is employed as a clerk of court. (Compl. ¶ 9). There is no factual support for that conclusion and Worthington no longer appears to take that view of her employment.

4

Segear's properties and retained the profits from the sale.   No facts are offered to support those conclusions.

According to the Complaint, Palmer at one time represented to the Circuit Court of the City of Richmond that Segear had died intestate.[2]   It is apparently on that ground that Worthington rests his central thesis:   that Segear actually died intestate and that, under the Virginia law of intestate succession, Worthington is entitled to "2/3 of Clyde H. Segear's estate."   From this string of conclusory assertions, Worthington tries to fashion several legal claims.

Worthington's claims are not delineated by count, but by paragraph in his Complaint.   In paragraph 40, he asserts that Defendants deprived Worthington, Segear, and Segear's wife:

> of their property and property rights by accelerating and causing the death of Clyde H. Segear, and generating a false diagnosis of incapacity/dementia through the unlawful use of Prednisone, to have Clyde H. Segear declared incapacitated/demented, all under color of state law and use of the courts of Virginia, in violation of 42 U.S.C. Sec. 1983 and the First and Fourteenth Amendments.

In addition, paragraph 40 alleges that all defendants conspired to achieve the alleged foregoing deprivation.

In paragraph 41, Worthington alleges that the defendants deprived him:

---

[2] That, says Worthington, occurred when Palmer filed an affidavit in "Richmond Probate Court."   (Compl. ¶ 31).

> of his First and Fourteenth Amendment rights
> to Companionship of his grandparents, and
> particularly his grandfather, Clyde H.
> Segear, by creating and maintaining false
> and inaccurate records that declared Clyde
> H. Segear incapacitated and demented for the
> sole purpose of unlawfully taking the
> property and property rights of Plaintiff
> "XW", and to not be deprived of
> companionship of his grandfather and his
> property and property rights without Due
> Process of law.

Here too, Worthington alleges that the defendants conspired with each other to effectuate those deprivations.

In paragraph 42, Worthington alleges that the defendants deprived him of his Fourteenth Amendment Due Process and Equal Protection rights "in the same manner as described in paragraph #41." This paragraph too has a generalized conspiracy assertion.

Worthington also asserts two state law claims. In paragraph 43 he alleges that each of the defendants committed medical malpractice and conspired to do so. In paragraph 44 he alleges that each of the defendants caused him "Intentional Infliction of Emotional Distress" and conspired to do so. Worthington seeks both compensatory and punitive damages, injunctive relief, declaratory relief, and attorneys' fees. (Compl. ¶¶ A-I).

All Defendants have timely filed Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), claiming that Worthington has failed to state any claim upon which relief can be granted. (ECF Nos. 7, 11, 13, 15, 26, 43). Palmer and Mooz have additionally filed motions to dismiss on grounds of insufficient service of process, pursuant to Fed. R. Civ. P. 12(b)(5). (ECF Nos. 27, 35). Defendants Jewish Family Services, Inc. ("Jewish Family Services"), Judges I and II (later discovered to be the same person, "Judge Yoffy"), Bon Secours – St. Mary's Hospital ("Bon Secours"), Crisinati, Donshea Smith ("Smith"), Castle Real Estate, Inc. ("Castle"), and Bonita Wallace ("Wallace") have also filed motions to dismiss on the ground that Worthington lacks standing to pursue several of his claims. (ECF Nos. 11, 13, 15, 43).

## II. DISCUSSION

### A.   Standard of Review

As a threshold matter, the Court recognizes that Worthington's pro se status entitles his pleadings to a liberal construction. See, e.g., Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted); Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978). Nevertheless, "[e]ven pro se plaintiffs must recognize Rule 8's vision for 'a system of simplified pleadings that give notice of the general claim asserted, allow for the preparation of a basic defense, narrow the issues to be

7

litigated, and provide a means for quick dispositions of sham claims.'" Sewraz v. Guice, 2008 WL 3926443, at *2 (E.D. Va. Aug. 26, 2008) (quoting Prezzi v. Berzak, 57 F.R.D. 149, 151 (S.D.N.Y. 1972)). The requirement of liberal construction "does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim cognizable in a federal district court." Skelton v. EPA, 2009 WL 2191981, at *2 (D.S.C. July 16, 2009) (citing Weller v. Dept. of Soc. Servs., 901 F.2d 387 (4th Cir. 1990)). Finally, the basic pleading standards set by Bell Atlantic v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009) that foreclose conclusory, factually unsupported claims apply to pro se litigants.

### 1. Fed. R. Civ. P. 12(b)(6)

All Defendants have filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, a complaint must "provide enough facts to state a claim that is plausible on its face." Robinson v. Am. Honda Motor Co., 551 F.3d 218, 222 (4th Cir. 2009) (quoting Twombly, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly,

8

550 U.S. at 556). A court "will accept the pleader's description of what happened...along with any conclusions that can be reasonably drawn therefrom," but "need not accept conclusory allegations encompassing the legal effects of the pleaded facts." Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 1998); Chamblee v. Old Dominion Sec. Co., L.L.C., 2014 WL 1415095, at *4 (E.D. Va. 2014). "Twombly and Iqbal also made clear that the analytical approach for evaluating Rule 12(b)(6) motions to dismiss requires courts to reject conclusory allegations that amount to mere formulaic recitation of the elements of a claim and to conduct a context-specific analysis to determine whether the well-pleaded factual allegations plausibly suggest an entitlement to relief." Id. In considering a motion to dismiss, the court may "properly take judicial notice of matters of public record." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

### B. Claims Against Judge Yoffy

Judge Yoffy argues that all of Worthington's constitutional and state law claims against him must fail because he enjoys absolute judicial immunity. (Def. Judges' Mem. of Law in Supp. of Mot. to Dismiss, at 5 (ECF No. 14)). That is clearly correct.

It is well-settled that judges are absolutely immune from suits for damages arising out of their judicial actions. See Pulliam v. Allen, 466 U.S. 522, 543 (1984); McCluskey v. New York State Unified Court Sys., 442 F. App'x 586, 588 (2d Cir. 2011) ("[T]he claims against the State Defendants are based solely on judicial acts performed by judges in their judicial capacity. Hence, the claims against Chief Judge Lippman are barred by the doctrine of judicial immunity."). Moreover, a judge enjoys absolute judicial immunity for actions within his judicial capacity even if his actions are allegedly in error or unconstitutional. Chu v. Griffith, 771 F.2d 79, 81 (4th Cir. 1985). A judge acts within his judicial capacity when the challenged act is "a function normally performed by a judge" and the parties "dealt with the judge in his judicial capacity." Stump v. Sparkman, 435 U.S. 349, 362 (1978).

"Judicial immunity can be overcome only where: (1) the judge engaged in nonjudicial actions--that is, 'actions not taken in the judge's judicial capacity'; or (2) there was a complete lack of jurisdiction." Rodriguez v. Doe, 549 F. App'x 141, 145 (4th Cir. 2013) (quoting Mireles v. Waco, 502 U.S. 9, 11-12 (1991)); see also Stump, 435 U.S. at 356 (noting that a judge is stripped of immunity only when he acts "in the clear absence of all jurisdiction."). Even where a judge may have acted without jurisdiction, "the scope of the judge's

10

jurisdiction must be construed broadly where the issue is the immunity of the judge." Stump, 435 U.S. at 356. The Supreme Court clearly has indicated that "[a] judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority." Id. at 356-357. Similarly, a sister court within the Fourth Circuit has recognized that judicial immunity applies "even when the judge is accused of acting maliciously and corruptly... 'not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences.'" Broessel v. Hutchinson, 2010 WL 3521564, at *7 (S.D. W. Va. Aug. 12, 2010) (internal citations omitted).

Here, Worthington does not allege in the Complaint that Judge Yoffy acted "in the clear absence of jurisdiction." Stump, 435 U.S. at 356. Nor could he, because it is entirely clear that both of the contested actions by Judge Yoffy are entirely "function[s] normally performed by a judge," and Worthington "dealt with the judge in his judicial capacity." Stump, 435 U.S. at 362. There are no facts to be found in the Complaint that might allow the Court to plausibly infer that Judge Yoffy's decision to appoint a guardian for Segear, and the subsequent decision not to rescind that guardianship, were

11

matters outside Judge Yoffy's jurisdiction as a Circuit Court judge.

Worthington argues in his Response that Judge Yoffy "abdicated his judicial authority, issued pronouncements based on this fraud and, therefore, was lacking jurisdiction[.]" (ECF No. 36, at 3). Worthington also repeats his allegations that Judge Yoffy "knew that a fraudulent document was presented to the court" and also adds that "his failure to recuse/disqualify himself[] divested him of jurisdiction." Id. at 8. However, these are conclusory allegations that are entirely unsupported by specific allegations of fact. Accordingly, the Court simply does not credit these unsupported allegations. Worthington's only remedy, if he is dissatisfied with Judge Yoffy's decisions, was to have appealed those decisions in state court. He did not do that. Therefore, all of Worthington's claims against Judge Yoffy will be dismissed.

### C.  Claims in Paragraph 40

In paragraph 40 of the Complaint, Worthington alleges that Defendants "conspired to, and did, deprive Plaintiff 'XW', and Clyde H. Segear and Alice B. Segear ["the Segears"], of their property and property rights...in violation of 42 U.S.C. Sec. 1983 and the First and Fourteenth Amendments." This paragraph, which the Court construes as a due process claim, fails to state a claim under Section 1983 because, for the reasons discussed

12

below, Worthington has not plausibly alleged that Defendants acted under color of state law. Because Worthington fails to allege a cognizable claim under § 1983, Worthington's conspiracy claims under § 1983 must fail as well. Furthermore, to the extent that Worthington attempts to bring a constitutional claim on the behalf of Mr. and Mrs. Segear, he lacks standing to do so.

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Amato v. City of Richmond, 875 F. Supp. 1124, 1132 (E.D. Va. 1994) (citing Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979))). To state a claim under § 1983, a plaintiff must allege, through specific factual assertions, that: (1) "the defendant has deprived him of a right secured by the Constitution and the laws of the United States"; and (2) "the defendant deprived him of this constitutional right under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970). Therefore, "the first step in any such claim is to identify the specific constitutional right allegedly infringed." Id. Where a plaintiff fails to plead a cognizable constitutional violation, he has no recourse under § 1983.

13

Furthermore, private persons only act "under color of law" for purposes of a Section 1983 claim when they are willful participants in joint activity with state officials. Id. at 152. This means that a plaintiff has no recourse under Section 1983 for private conduct, "no matter how discriminatory or wrongful." Mentavlos v. Anderson, 249 F.3d 301, 310 (4th Cir. 2001) (citation omitted). Moreover, "private misuse of a state statute does not describe conduct that can be attributed to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 941 (1982). In particular, it is well-settled that "an attorney, whether retained, court-appointed, or a public defender, does not act under color of state law." Lilly v. Knox, 2007 WL 1146344, at *3 (D.S.C. Apr. 10, 2007) (collecting cases).

To successfully plead a conspiracy under Section 1983, a plaintiff, through "more than a naked assertion of conspiracy between a state actor and private parties," must plausibly allege that Defendants acted jointly in concert, and that some overt act was done in furtherance of the conspiracy that resulted in the plaintiff's deprivation of some constitutional right. Shooting Point, LLC v. Cumming, 243 F. Supp. 2d 536, 537 (E.D. Va. 2003). That is, a plaintiff must plausibly allege deprivation of a constitutional right in order to state a claim for civil conspiracy under § 1983, because "'[t]he gist of the cause of action is the deprivation and not the conspiracy.'"

14

Id. (quoting Lesser v. Braniff Airways, Inc., 518 F.2d 538, 540 n.2 (7th Cir. 1975)). Importantly, "[a] plaintiff must make something more than a naked assertion of conspiracy between a state actor and private parties." Id. at 421-23.

### 1. Worthington's Claims on His Own Behalf

Because the First Amendment is not the proper source for protection of "property and property rights," the Court construes Worthington's Paragraph 40 claims on his own behalf as a Due Process claim, brought under Section 1983. However, Worthington has failed to show that any of the remaining Defendants acted "under color of state law." Therefore, the claims in Paragraph 40 will be dismissed with prejudice as to all Defendants.

First addressing Worthington's claims against the McGrath Defendants, it is clear that McGrath, Norment, and McGrath, P.C. are private actors. No allegations suggest otherwise. No authority holds otherwise.

Nor did the status of Keuken/Rittenberry as a notary public employed by McGrath, P.C. transform her actions, or those of any other defendants, into conduct "fairly attributable to the state." Filarsky v. Delia, 132 S. Ct. 1657, 1661 (2012) (internal citation omitted). Although it does not appear that the Fourth Circuit has specifically addressed whether a privately employed notary public is automatically a "state

15

actor" for purposes of § 1983, the Court finds persuasive the reasoning of the district court in Williams v. Nat'l Notary Assoc.-Florida, 2008 WL 8122804 (M.D. Fla. Nov. 4, 2008). As the court in Williams observed, a notary public is not a state official. And, although the Code of Virginia refers in passing to the "office" of notary public, the statute as a whole makes clear that a notary public merely holds a "commission." Va. Code Ann. §§ 47.1-21 et seq. Also, the "statutory powers and duties given to notaries public are ministerial: the power to administer oaths," the power to certify that a copy of a document is a true copy thereof, to certify affidavits or depositions of witnesses, and to perform verifications of fact. Williams, 2008 WL 8122804, at *4; Va. Code Ann. § 47.1-12. Such ministerial actions "are not imbued with the imprimatur of the State, as are those of public officials." Id. Moreover, "the statute recognizes the widely known fact that, [as here,] notaries public are often employed by private entities." Id.; see also Va. Code Ann. § 47.1-27 (detailing the liability of a notary's employer). As explained in Williams, the employment "of many notaries public by nongovernmental entities strongly suggest[s] that a notary public is not a public official, as public officials are typically employed by the State in an official capacity." Id. Other district courts to have addressed the issue have reached this same conclusion. See

16

Sanders v. the Cty. of Bradford, 2014 WL 10294769, at *5 n.6 (M.D. Pa. Nov. 21, 2014); Hall v. Tallie, 2014 WL 9311958, at *8 (N.D. Ala. Mar. 10, 2014); Noonan v. Allen, 2012 WL 6726711, at *1 (D. Md. Dec. 21, 2012). Here, Keuken/Rittenberry acted in her capacity as an employee of private actor McGrath, P.C., when she notarized Segear's will, and that action is not "fairly attributable to the state."

Thus, Worthington's conclusory allegations that Norment, McGrath, and Keuken/Rittenberry conspired to concoct a "fraudulent Last Will and Testament" fail to reveal any actions taken by any state actor under color of state law, as is required to state a claim under § 1983. Moreover, although Worthington repeatedly asserts that the McGrath defendants conspired with Judge Yoffy, he fails to allege any facts from which the Court could infer that any conspiracy actually occurred. There is no plausible predicate that supports Worthington's conclusory conspiracy claim in paragraph 40.

Second, with respect to Defendants Bonita Wallace and Castle Real Estate, Inc., ("the Castle Defendants"), Worthington has failed to provide any specific facts showing that the Castle Defendants were involved with the state court proceedings in any way. Indeed, the sole brief mention of the Castle Defendants in the Complaint reveals only that Worthington spoke by telephone with Wallace, a real estate agent, and that Wallace provided

Worthington's contact information to Palmer.   (Compl. ¶¶ 25-26).
Worthington has failed to allege that the Castle Defendants
acted "under color of state law."

Worthington's reply brief contends that the Castle
Defendants must have conspired with Palmer because the two had
offices in the same building, and that "they,
therefore...conspired thereafter to consummate the unlawful
taking with Defendants Judge Yoffy and Notary Keuken-
Rittenberry."[3]   (ECF No. 57, ¶ 14).   Fanciful, conclusory
allegations of that sort simply do not support the existence of
any conspiracy.   Nor do they in any way suffice to make a
plausible case that the McGrath defendants were somehow state
actors.

Thus, the Complaint fails to state a claim against the
McGrath defendants both because of the absence of a plausible
theory of state action and because it fails to meet the
requirements of Twombly and Iqbal as to the conspiracy aspect of
paragraph 40.

---

[3] Because the Court finds that Keuken/Rittenberry is not a state
actor, the Court devotes no further discussion to Worthington's
arguments that the remaining defendants' alleged conspiracy with
her renders their conduct state action within the meaning of §
1983.   However, even if Keuken/Rittenberry were a state actor,
the Complaint provides no factual basis to support the
conclusory argument that any defendants either in, or outside
of, McGrath, P.C. entered into any agreement with
Keuken/Rittenberry.

Similarly, Worthington offers nothing more than repetitive legal conclusions to support his contention that Defendants Tara Crisinati, Donshea Smith, and Bon Secours ("the Bon Secours Defendants") conspired with Judge Yoffy, or anyone, for that matter. Indeed, Worthington does not even allege that any of the Bon Secours Defendants had any contact whatsoever with Judge Yoffy, much less that they reached any sort of agreement. Worthington only states, in conclusory fashion, that "Defendant Jewish Family Services (JFS) <u>and thus Bon Secours and all defendants</u>, knew as a matter of fact, and law, that XW visited his grandfather regularly over the years prior to his demise." (ECF No. 52, ¶ 7) (emphasis added). However, Worthington does not allege how or why Jewish Family Services might have possessed such knowledge, why such knowledge should be imputed to the Bon Secours Defendants, or how such knowledge shows that the Bon Secours Defendants were "jointly engaged with state officials in the prohibited action." <u>Adickes</u>, 398 U.S. at 152 (quoting <u>United States v. Price</u>, 383 U.S. 787, 794 (1966)). In a document titled "Sur-Reply Affidavit," (which, ironically, is not notarized or otherwise sworn) Worthington again alleges that "Bon Secours, Castle Defendants, JFS, Yoffy, Keuken-Rittenberry, and their other co-conspirator defendants deprived XW of his right to be his grandfather's guardian/conservator..." (ECF No. 58, ¶ 18). The Court can discern no facts in any of

19

Worthington's filings that provide any plausible support for the allegation that the Bon Secours Defendants had any role in the alleged conspiracy. Thus, Worthington has failed to plausibly allege that the Bon Secours Defendants acted "under color of state law." Moreover, as to those defendants, the Complaint fails the test of Twombly and Iqbal as to the conspiracy aspects of paragraph 40.

The only allegations even mentioning Defendant Jewish Family Services, found in one of Worthington's many "Affidavits" filed in response to Defendants' motions to dismiss, are even more conclusory. Worthington says that "JFS is being sued as a co-conspirator with two state actors," that "JFS was privy to all that occurred," and that "JFS was a willing party to the fraudulent, invalid 'Last Will and Testament.'" (ECF No. 49, ¶¶ 8-9, 17). These allegations present a textbook example of "'naked assertions' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 677 (internal citation omitted). Worthington has failed to offer any facts from which the Court could infer that Jewish Family Services acted "under color of state law" for purposes of § 1983 or that it engaged in a conspiracy with others who were state actors. Thus, as to Jewish Family Services, the Complaint fails to satisfy Twombly and Iqbal both as to its state actor contentions and as to its conspiracy contentions.

With respect to Mooz, Worthington again attempts to establish a conspiracy by alleging that:

> [n]ot only is a Judge sued as a co-conspirator in this action, but also [Ms. Rittenberry], the Notary Public, who produced the fraudulent...'Last Will and Testament of Clyde H. Segear,' which Ms. Mooz alludes to in her pleadings...[Ms. Mooz] has been using this fraudulent...'Last Will and Testament'...to claim disinheritance of [Worthington's] mother and, therefore, no entitlement to inheritance rights of any kind for [Worthington].

(ECF No. 55, ¶¶ 6-8). Worthington also alleges that Mooz "initiated a number of interviews with Clyde H. Segear with a determined idea to have him deemed incapacitated." (Compl. ¶ 18). However, Worthington does not provide any factual support for the conclusion that Mooz ever created any sort of pact, illicit or otherwise, with Judge Yoffy, or that Mooz had any reason to think that Segear's will was fraudulent or invalid. Thus, the Complaint is devoid of any plausible basis upon which Mooz was a state actor.[4]

---

[4] Alternatively, even if the Court were to find that Mooz acted on behalf of the state in her capacity as guardian ad litem, she would be entitled to absolute immunity from § 1983 claims, "given that the complaint discloses no actions complained of that occurred outside of the proceedings during which [Palmer] was acting as guardian ad litem." Murphy v. Goff, 2010 WL 2292130, at *4 (W.D. Va. June 7, 2010) (citing Fleming v. Asbill, 42 F.3d 886, 889 (4th Cir. 1994) ("[e]ven if Asbill lied to the judge in open court, she was still acting as the guardian, and is immune from § 1983 liability.")); see also

Finally, the same is true for Defendant Rose Palmer. As noted above, "lawyers do not act 'under color of state law' merely by making use of the state's court system." Fleming v. Asbil, 42 F.3d 886, 890 (4th Cir. 1994) (quoting Dennis v. Sparks, 449 U.S. 24, 28 (1980)). Worthington has alleged that Palmer sought appointment as Segear's guardian, "failed to attempt to contact Plaintiff 'XW'" prior to doing so, failed to provide Worthington with information concerning his grandparents, and subsequently "filed a Real Estate Affidavit in the Probate Court of Richmond City." (Compl. ¶¶ 21-22, 30). None of those assertions establish that Palmer was a state actor in failing to do what Worthington alleges that she did not do.

And, even if she was a state actor (and she is not), those allegations posit no wrongdoing by Palmer, because there is no allegation that she was obligated to contact Worthington before qualifying as Segear's Conservator or that she was obligated to give Worthington information about his grandparents. There is no cited authority that such obligations exist, and the Court found no authority to that effect.[5]

Worthington tries to establish state action by alleging that Palmer somehow conspired with Judge Yoffy to deprive

---

Serdah v. Edwards, 2011 WL 3849703, at *3 (W.D. Va. Aug. 30, 2011).

[5] Nor is there any alleged wrong in the filing of the alleged Real Estate affidavit, or any basis in law to believe that doing so was somehow wrongful.

22

Worthington of his inheritance.  However, the Complaint contains no pleaded facts that plausibly (or otherwise, for that matter) posit a conspiracy between those two for that, or any other, purpose.

In sum, the Complaint provides no basis to consider that Palmer was a state actor as to her own conduct or as to the allegedly actionable conduct with Judge Yoffy insofar as paragraph 40 is directed toward Palmer.  Nor does the Complaint meet the Twombly and Iqbal requirements as to the conspiracy aspect of paragraph 40.

Because Worthington has failed to allege with any particularity that any of Defendants' conduct is "fairly attributable to the state," the claims in Paragraph 40 must fail.  In any event, as a sister district court aptly summarized, "a complaint by plaintiff[] that [his] inheritance under [his] grandparents' wills is insufficient or that property under those wills has been allocated in a manner not to [his] liking does not constitute a cause of action that Section 1983 was intended to address."  Poling v. K. Hovnanian Enters., 99 F. Supp. 502, 513 (D.N.J. 2000).  That certainly is so here. Therefore, the claims in Paragraph 40 based on the deprivation of Worthington's own Due Process rights will be dismissed as to all Defendants.

## 2. Claims on Behalf of Mr. and Mrs. Segear

In Paragraph 40 of his Complaint, Worthington also alleges that Defendants deprived Worthington "and Clyde H. Segear and Alice B. Segear of their property and property rights" in violation of the First and Fourteenth Amendments. In addition to Worthington's failure to plausibly allege state action, to the extent that Worthington wishes to bring any claims on behalf of the Segears, he lacks standing to pursue claims on behalf of Segear or Mrs. Segear.

The standing requirement is met only where three conditions are satisfied: "(1) the plaintiff must allege that he or she suffered an actual or threatened injury that is not conjectural or hypothetical; (2) the injury must be fairly traceable to the challenged conduct; and (3) a favorable decision must be likely to redress the injury." Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992)). Moreover, the Supreme Court has established that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 499 (1975); see generally Allen v. Wright, 468 U.S. 737, 750 (1984) (noting that standing doctrine prohibits a litigant from raising another party's rights). As the party

invoking federal jurisdiction, the plaintiff bears the burden of establishing these elements. <u>Lujan</u>, 504 U.S. at 560-61.

With respect to third-party standing, a party may assert claims on behalf of another only if he can show that: (1) the litigant and the third party suffered the same "injury in fact," (2) the litigant must have a "close relationship" with the third party, and (3) there must exist some hindrance to the third party's ability to bring suit for herself. <u>Powers v. Ohio</u>, 499 U.S. 400, 410-411 (1991). Furthermore, in Virginia, constitutional claims on behalf of a decedent must be brought by the decedent's personal representative. <u>See, e.g.</u>, <u>Stephens v. Cty. Of Albemarle</u>, 2005 WL 3533428, at *9 (W.D. Va. Dec. 22, 2005); <u>O'Connor v. Several Unknown Correctional Officers</u>, 523 F. Supp. 1345, 1348 (E.D. Va. 1981).

Worthington does not allege, nor could he, that he is Segear's appointed personal representative. Therefore, he lacks standing to bring any claims on Segear's behalf. Moreover, with respect to his claims on behalf of Alice Segear, at a minimum, Worthington fails the third prong of the <u>Powers</u> test, because he has alleged no reason why Ms. Segear cannot bring suit on her own behalf. Thus, Worthington's claims on behalf of the Segears will be dismissed for lack of standing.

### D.    Claims in Paragraph 41

Worthington claims in Paragraph 41 of the Complaint that Defendants have violated his constitutional rights under the First and Fourteenth Amendments to the companionship of his grandparents. The Court interprets this paragraph as attempting to bring both a substantive due process claim under the Fourteenth Amendment, and a right of association claim under the First Amendment. However, Worthington has offered no legal support for this assertion, and because the Court can find no precedent to support the existence of such rights under either the First or Fourteenth Amendments, Worthington's constitutional claims pertaining to the deprivation of his grandparents' companionship must be dismissed.

Neither the Fourth Circuit nor the Supreme Court has ever held, or even implied, that adult grandchildren have a constitutional right to visit and speak on the telephone with their grandparents under the Fourteenth Amendment. At most, the Supreme Court has held that the state may not constitutionally prohibit grandparents from living with their minor grandchildren.    Moore v. City of East Cleveland, 431 U.S. 494 (1977). However, the context of this right is quite limited, and has never been interpreted to encompass a right to companionship. As one sister court within the Fourth Circuit wisely noted:

26

> [The] substantive due process cases do not hold that family relationships are, in the abstract, protected against all state encroachments, direct or indirect, but only that the state may not interfere with an individual's right to choose how to conduct his or her family affairs. The emphasis in these cases on <u>choice</u> suggests that the right is one of preemption; rather than an absolute right to a certain family relationship, family members have the right, when confronted with the state's attempt to make choices for them, to choose for themselves.

<u>Willard v. City of Myrtle Beach</u>, 728 F. Supp. 397, 402 (D.S.C. 1989). Indeed, the Supreme Court has held that the fundamental Fourteenth Amendment right of parents to make child-rearing decisions allows parents to <u>deny</u> grandparents the companionship of their grandchildren, thus implying, in accord with the district court's assessment in <u>Willard</u> and contrary to Worthington's argument, that grandparent-grandchild companionship is not a constitutionally protected interest. <u>Troxel v. Granville</u>, 530 U.S. 57 (2000). Furthermore, courts must be "reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this uncharted area are scarce and open-ended." <u>Collins v. Harker Heights</u>, 503 U.S. 115, 125 (1992). Therefore, the Court declines to recognize such an interest here.

Similarly, no court has recognized such a deprivation of grandparental companionship claim under the First Amendment right of association. Supreme Court associational jurisprudence consists of two distinct doctrinal threads: first, the right of association protects "certain kinds of highly personal relationships," and second, it provides a "right to associate for the purpose of engaging in those activities protected by the First Amendment--speech, assembly, petition for the redress of grievances, and the exercise of religion." Roberts v. United States Jaycees, 468 U.S. 609, 617-618 (1984). Concerning the former, the Supreme Court has noted that "the relationships that might be entitled to this sort of constitutional protection are those that attend the creation and sustenance of a family--marriage; the raising and education of children; and cohabitation with one's relatives." Id. at 619 (citations omitted).

Unsurprisingly, given the close parallels between substantive due process doctrine and the First Amendment protections concerning "the creation and sustenance of a family," the Court has been unable to locate any appellate decision expanding the First Amendment right of association to encompass mere companionship. The Court therefore declines to recognize such a right here. Worthington's constitutional claims under the First and Fourteenth amendments concerning the

28

companionship of his grandparents as asserted in paragraph 41 will accordingly be dismissed as to all Defendants.

### E.    Claims in Paragraph 42

In Paragraph 42 of the Complaint, Worthington claims that Defendants "conspired to, and did, deprive Plaintiffs [sic] herein of their Fourteenth Amendment Due Process and Equal Protection Rights in the same manner as described in paragraph #41." (Compl. ¶ 42). Worthington's due process claims fail for the reasons discussed in Part C above, so that analysis will not be repeated here. Additionally, Worthington provides no facts supporting a claim to relief under the Equal Protection Clause, and therefore the remaining claims in Paragraph 42 will also be dismissed as to all defendants.

To plead an equal protection violation based on facially valid laws or ordinances, a plaintiff must plausibly allege that: (1) he was treated differently from others who are similarly situated; and (2) that such treatment was intentional or purposeful.    Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Id.

Here, even taking into account the more liberal pleading standards for pro se plaintiffs, the Court is unable to discern a single allegation in the Complaint tending to show that

29

Worthington was "treated differently from others who are similarly situated." Morrison, 239 F.3d at 654. For that matter, "others who are similarly situated" are altogether absent from the narrative; the Complaint concerns only the alleged mistreatment of Worthington and his grandparents. This single conclusory paragraph claiming Due Process and Equal Protection violations fails to provide even a "sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678. Therefore, Worthington's claims in Paragraph 42 shall be dismissed with prejudice as to all Defendants.

### F.    Claims in Paragraph 43

In Paragraph 43 of the Complaint, Worthington alleges that all Defendants "conspired to, and did, commit Medical Malpractice." Defendants argue that Worthington does not have standing to pursue any medical malpractice claim on behalf of Segear. They are correct.

Virginia Code § 8.01-229(B)(1) provides that only a decedent's personal representative has standing to bring a medical malpractice claim on behalf of the decedent. As discussed in Part C.2 above, Worthington is not the personal representative of Segear. Thus, Worthington does not have standing to bring any medical malpractice claims on behalf of Segear, and Worthington's medical malpractice claims will be dismissed with prejudice as to all Defendants.

G.    **Claims in Paragraph 44**

In Paragraph 44 of the Complaint, Worthington claims that all defendants "individually and collectively, conspired to, and did, cause Intentional Infliction of Emotional Distress on Plaintiff." Under Virginia law, in order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must allege, and prove by clear and convincing evidence, that: (1) defendant's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) the conduct was causally related to Plaintiff's emotional distress; and (4) Plaintiff's distress was severe. Womack v. Eldridge, 215 Va. 338, 342 (1974). The alleged emotional distress must be "the type of extreme emotional distress that is so severe that no reasonable person could be expected to endure it." Russo v. White, 241 Va. 23 (1991). However, pursuant to Fed. R. Civ. P. 8, federal plaintiffs need not comply with the heightened pleading standard required by Virginia courts. Hatfill v. New York Times Co., 416 F.3d 320, 337 (4th Cir. 2005). Nonetheless, the plaintiff still must substantiate the severity of his emotional distress with more than "bare assertions devoid of further factual enhancement." Iqbal, 556 U.S. at 678-79 (internal citation omitted).

Even assuming that Worthington has satisfied the first three elements of the test above, he has pleaded no specific

31

facts tending to show that his emotional distress is severe. Indeed, Worthington has alleged no physical, reputational, or psychological harm beyond this single conclusory paragraph. Because Worthington has failed adequately to plead the element of severe distress, he has failed to allege facts that, if proved, would entitle him to relief on this claim. Worthington's statement that "defendants...did[] cause Intentional Infliction of Emotional Distress on Plaintiff" is a conclusory legal allegation and not entitled to any weight. Thus, Worthington's claims for intentional infliction of emotional distress in paragraph 44 will be dismissed as to all Defendants.

### H.   Worthington's Common Law Conspiracy Claims

Although it is not entirely clear from the Complaint, it appears that Worthington asserts a claim against all Defendants for common law civil conspiracy. (Compl. ¶¶ 31, 33, 35, 40-44). However, because Worthington has failed to sufficiently allege any underlying wrong, as is required by Virginia law, Worthington's civil conspiracy claims will be dismissed against all Defendants.

Under Virginia law, a plaintiff asserting a civil conspiracy claim must allege facts sufficient to show: (1) an agreement between two or more persons (2) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful

32

means, which (3) results in damage to plaintiff. Firestone v.
Wiley, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007) (citing Glass v.
Glass, 228 Va. 39, 47 (1984)). Importantly, where "there is no
actionable claim for the underlying alleged wrong, there can be
no action for civil conspiracy based on that wrong." Citizens
for Fauquier County v. SPR Corp., 37 Va. Cir. 44, 50 (1995). In
other words, "in Virginia, a common law claim of civil
conspiracy generally requires proof that the underlying tort was
committed." Almy v. Grisham, 237 Va. 68, 81 (2007). Moreover,
"there can be no conspiracy to do an act which the law allows."
Hechler Chevrolet, Inc. v. Gen. Motors Corp., 230 Va. 396, 402
(1985).

Furthermore, to survive a motion to dismiss, it is not
enough merely to allege that the conspiracy took place; a
plaintiff must allege facts supporting the existence of a
conspiracy with particularity. See Bay Tobacco, LLC v. Bell
Quality Tobacco Prods., LLC, 261 F. Supp. 2d 483, 499-500 (E.D.
Va. 2003). As explained in Bay Tobacco, the plaintiff must
plead agreement in more than mere conclusory language in order
to survive a motion to dismiss, because "a conspiracy claim
asserted in mere conclusory language is based on inferences that
are not fairly or justly drawn from the facts alleged." Id.

33

Worthington's allegations of conspiracy fail that test. First, Worthington's claims that Defendants conspired to commit medical malpractice and intentionally inflict emotional distress must fail because, for the reasons stated above, Worthington has failed to state a claim for the underlying torts. Second, Worthington has failed to plead his claims of conspiracy with sufficient particularity. Even construing the complaint liberally, Worthington did not state any specific facts tending to show that any Defendants made any agreement among themselves to commit medical malpractice or to intentionally inflict emotional distress on Worthington. Therefore, Worthington has failed to state a claim for common law conspiracy, and Worthington's conspiracy claims will be dismissed with prejudice as to all Defendants.

### CONCLUSION

For the reasons set forth herein, Worthington's Complaint will be dismissed as to all claims and all Defendants.

It is so ORDERED.

_____/s/_____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: November 24, 2015

34